**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ACE METAL CRAFTS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 26-cv-04397 |
| | ) | |
| HARLEYSVILLE WORCESTER | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>COMPLAINT</u>**

Now comes Plaintiff, Ace Metal Crafts Company ("Ace"), through its undersigned attorneys, David B. Goodman, Kalli K. Nies, and Michael J. Hutcherson, Goodman Law Group | Chicago *of counsel*, and states as follows as its Complaint against Harleysville Worcester Insurance Company ("Harleysville"):

**<u>NATURE OF THE ACTION</u>**

1. This litigation arises from Harleysville's failure to fulfill its contractual obligations to its insured, Ace, following the mechanical breakdown of a laser cutting machine (the "Laser") used by Ace in the fabrication of specialized steel products.

2. Harleysville initially accepted the claim as a covered loss when the costs of repair appeared minimal, but when attempts at repair of the Laser were unsuccessful, Harleysville wrongly denied Ace's claim, contending that the damage was the result of "wear and tear." Further, Harleysville exacerbated the business interruption losses sustained by Ace by requiring additional attempts at repair rather than replacing the Laser. Although Harleysville, after pressure from Ace, paid a portion of the business interruption losses incurred by Ace, a substantial portion of Ace's

1

covered claim remains unpaid. Through this lawsuit, Ace seeks to recover the remainder of the covered loss due to it under the Equipment Breakdown Coverage underwritten by Harleysville.

3. Ace also seeks recovery pursuant to Section 155 of the Illinois Insurance Code arising from the unreasonable and vexatious delay by Harleysville in the payment of Ace's claim, including through its improper attempts to cause the firm that attempted repairs to suggest that repair rather than replacement was feasible when, in fact, that was not the case.

## THE PARTIES

4. Plaintiff, Ace, is a corporation organized under the laws of the State of Illinois, with its principal place of business in Bensenville, Illinois. Thus, Ace is a citizen of the State of Illinois.

5. Defendant, Harleysville, is a corporation organized under the laws of the state of Ohio, with its principal place of business in Columbus, Ohio. Thus, Harleysville is a citizen of the State of Ohio.

## JURISDICTION AND VENUE

6. Jurisdiction in this matter is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1).

7. Diversity jurisdiction exists because: (a) there is complete diversity of citizenship between Ace and Harleysville, and (b) Ace seeks damages in excess of $75,000.

8. Venue is appropriate under 28 U.S.C. § 1391 because the making of the insurance contract and the losses resulting from the mishandling of the claim resulting from the breakdown of the Laser were incurred in the Northern District of Illinois.

**GENERAL ALLEGATIONS**

**A. The Policy**

9. Ace purchased a commercial lines insurance policy underwritten by Harleysville as policy number COP00000087928Y effective November 20, 2021 to November 20, 2022 (the "Policy"). A true and correct copy of the Policy is attached as **Exhibit 1**.

10. Through the Equipment Breakdown Coverage Part of the Policy, Harleysville agreed to cover the "direct physical damage to covered property that is a direct result of an 'accident' to 'covered equipment' at 'covered locations'." Ex. 1 at 109.

11. Ace is the Named Insured on the Policy. Ex. 1 at 20.

12. Business is defined as "the usual business operations occurring at 'covered locations'…" Ex. 1 at 45.

13. "Accident" is defined as a fortuitous event that causes direct physical damage to "covered equipment" caused by, in relevant part, mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force. Ex. 1 at 109.

14. Restoration Period is defined, in relevant part, in the Policy as, "[t]he time it should reasonably take to resume '[Ace's] 'business' to a similar level of service starting from the date of a physical loss of or damage to property at a 'covered location' that is caused by a covered peril and ending on the date: 1) the property should be rebuilt, repaired, or replaced…" Ex. 1 at 48.

15. The Coverage Equipment Breakdown Coverage Part also provides coverage for "Income Coverages." Ex. 1 at 112 §5.

16. Through the "Income Coverages," Harleysville agreed to provide coverage for earnings, "rents", and extra expense as elected by Ace. Ex. 1 at 29-30, Declarations.

3

17. The Equipment Breakdown Coverage part describes "Earnings" as the "actual loss of net income (net profit or loss before income taxes) that would have been earned or incurred and continuing operating expenses normally incurred by '[Ace's]' 'business,' including but not limited to payroll expenses." Ex. 1 at 112.

18. The Policy provides coverage for "Extra Expense" which is necessary during the "restoration period" that "'[Ace]"would not have incurred if there had been no direct physical loss of damage to property caused by or resulting from an 'accident'… to 'covered property'." Ex. 1 at 112.

**B. The Equipment Breakdown**

19. Ace fabricates stainless steel products using laser cutting, including the Laser at issue, in its production process.

20. In February 2022, the Laser became damaged after being struck by a piece of sheet metal while it was being operated. The damage caused by the accident substantially impaired the performance of the Laser.

21. Ace submitted claim no. 581008-GP/321454-GO (the "Claim") to Harleysville for the property damage the Laser sustained due to the accident.

22. Harleysville reimbursed the initial cost of the attempted repairs and replacement parts, but denied that there was any loss of income coverage available for the Claim.

23. Five months after the putative repairs were completed, the Laser broke down once again, displaying the same modes of failure and establishing the failure of the initial attempt at repair.

24. Ace undertook additional repairs and re-submitted the claim to Harleysville seeking reimbursement for the repairs related to the Accident.

25. While Harleysville initially denied the Claim, it ultimately paid for the necessary repairs required to repair the damage to the Laser in November 2023.

26. In March 2024, the Laser broke down for a third time, exhibiting the same issues caused by the Accident that occurred in March 2023.

27. Ace timely notified Harleysville of the issue and advised Harleysville that the repair firm conceded that it could not repair the Laser and recommended replacing the Laser.

28. However, despite the fact that the initial attempts at repair had failed, Harleysville declined to fund replacement of the Laser until Harleysville satisfied itself that the Laser could not be repaired, despite the fact Ace had attempted to repair the Laser since it was first damaged in February 2022 without success.

29. Moreover, the requisite parts needed to attempt the repair were not available, and the firm that had previously attempted the repair declined to stand behind its work and warrant the performance following attempted repairs.

30. In the interim, on information and belief, Harleysville, through its agent, communicated with the repair firm pressuring it to certify that the repairs were successful and that the Laser did not require replacement.

31. After a substantial delay by Harleysville, and pressure from Ace, Harleysville reconsidered its position and acknowledged that the breakdown resulted from the accident and conceded the Laser was covered.

32. Ultimately, in November and December 2024, Harleysville finally permitted and funded the replacement of the laser cutting machine (the "Replacement").

**C. The Business Interruption**

33.     Ace continued to operate between the initial equipment breakdown due to damage to the head of the Laser in February 2022 and the installation of the Replacement in December 2024.

34.     However, during this period the Laser only operated at a substantially reduced capacity due to the damage.

35.     The Laser was not able to track design specifications within the narrow margin of variation acceptable to comply with designs.

36.     Cuts made by the Laser did not meet design specifications, as the Laser's cutting resulted in ragged edges referred to as "burrs."

37.     To mitigate its damages, Ace incurred Extra Expense by continuing to undertake its operations. Specifically, due to the damage to the Laser, it could only be operated at 40% of its full operational speed and required Ace to undertake deburring processes, such as sanding and grinding, to address the Laser's inefficient performance in its damaged state.

38.     But despite Ace's attempts to continue operations to mitigate its damages, the reduction in the Laser's performance and the increased labor costs increased Ace's cost per unit.

39.     At the same time, Ace's production decreased as the Laser could not maintain its prior production levels.

40.     Ace lost clients due to the Laser's inability to operate at full capacity.

41.     Harleysville's demand that Ace repair the Laser, rather than agreeing to replace the Laser, over a period of two and a half years, resulted in a longer period of reduced operational capacity than replacing the machine.

6

**Count I**
**Breach of Contract**

42.     Ace repeats and realleges the allegations of paragraph 1 through 41 as the allegations of this paragraph.

43.     The Claim includes a claim for payroll expenses as that term is described in the Policy.

44.     The Claim includes a claim for extra expense as that term is described in the Policy.

45.     The Claim includes a claim for inventory and appraisal expenses as that term is described in the Policy.

46.     Under the Policy, Harleysville is obligated to pay for loss including payroll expenses, extra expenses, and inventory and appraisal expenses as described in the Claim.

47.     The Policy is valid and enforceable.

48.     Ace timely tendered the Claim to Harleysville.

49.     Ace has met its obligations under the terms of the Policy in connection with the Claim.

50.     Harleysville has accepted and made payment for most repair and replacement costs in connection with the Claim.

51.     However, Harleysville has breached its obligations under the Policy by refusing to reimburse Ace's payroll expenses, extra expenses, property damages, and inventory and appraisal expenses submitted in connection with the Claim.

52.     Ace has sustained damages from Harleysville's failure to meet its obligations under the Policy including expenses incurred for payroll expenses, increased operating costs, property damage, and appraisal expenses.

WHEREFORE, Plaintiff Ace requests that this Court enter a judgment in its favor and against Defendant Harleysville as follows:

    i.    Awarding damages in an amount to be determined at trial;

    ii.    Pre and post judgment interest;

    iii.    Awarding such other and further relief as the Court deems just and proper.

## Count II
## Bad Faith

53.    Ace repeats and realleges the allegations of paragraph 1 through 41 as the allegations of this paragraph.

54.    Ace timely tendered the Claim to Harleysville.

55.    Harleysville forced Ace to undertake lengthy repairs to the Laser rather than agreeing to replace it.

56.    The repair process imposed on Ace by Harleysville forced Ace to operate at a diminished capacity.

57.    During the time Ace was forced to operate at a diminished capacity, Ace incurred costs for payroll expenses, increased operating costs, property damage, and appraisal expenses as a result of the delays caused by Harleysville.

58.    These costs incurred by Ace in connection with the Claim are covered under the Policy.

59.    Harleysville knowingly misrepresented policy provisions and requirements relating to its demand that Ace attempt repair of the Laser.

60.    Harleysville sought to evade its obligation to replace the Laser by forcing Ace to attempt repairs rather than replace the Laser.

61. Further, upon information and belief, Harleysville communicated directly with the repair firm brought in to fix the Laser, unbeknownst to Ace.

62. Upon information and belief, through these communications Harleysville sought to impose repairs that the repair firm was unwilling to stand behind in effort to avoid the cost of the Replacement.

63. Although Harleysville was aware of the attempts made to repair the Laser its continued focus on repair versus replacement was unreasonable and increased Ace's damages.

64. Harleysville has failed to reimburse all the costs Ace has incurred and which Harleysville is required to reimburse under the Policy.

65. By failing to reimburse these costs, Harleysville has not attempted in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear.

66. Harleysville's delay in providing Ace reimbursement for payroll expenses, increased operating costs, property damage, and appraisal expenses is vexatious and unreasonable in violation of 215 ILCS 5/155 as there is no bona fide coverage dispute and Ace is entitled to coverage.

WHEREFORE, Plaintiff Ace requests that this Court enter a judgment in its favor and against Defendant Harleysville as follows:

    i. Awarding damages in an amount to be determined at trial;

    ii. Pre and post judgment interest;

    iii. Awarding attorney's fees, costs, and other relief provided for in 215 ILCS 5/155; and

    iv. Awarding such other and further relief as the Court deems just and proper.

**JURY DEMANDED**

Dated: April 20, 2026                                  Respectfully submitted,

                                                       ACE METAL CRAFTS COMPANY

                                                       By: /s/ *David B. Goodman*
                                                       One of its attorneys

David B. Goodman – dg@glgchicago.com
    ARDC #6201242
Kalli K. Nies – kn@glgchicago.com
    ARDC #6318089
Michael J. Hutcherson – mh@glgchicago.com
    ARDC #6350417
Goodman Law Group | Chicago
20 North Clark Street, Suite 3300
Chicago, Illinois 60602
Tel: (312) 626-1888

10